```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW HAMPSHIRE
```

United States of America

    v.                                    Criminal No. 18-cr-160-01-JL
                                            Opinion No. 2019 DNH 100

Eleazar Flores-Mora


**<u>MEMORANDUM ORDER</u>**

    Defendant Eleazar Flores-Mora moved to suppress statements he allegedly made when he was questioned at his residence by two Immigration and Customs Enforcement ("ICE") agents. This motion turns on whether Flores-Mora was in custody during the questioning. After an evidentiary hearing, the court finds that Flores-Mora was not in custody, and so was not entitled to the familiar Miranda warnings required in custodial interrogation. His motion is therefor denied.

    Flores-Mora moved to suppress any statements he allegedly made regarding his citizenship or alienage during two encounters with ICE agents, based on Miranda v. Arizona, 384 U.S. 436 (1966). The prosecution did not seek to admit any statements from the second encounter, leaving only the earlier events of September 8, 2009 at issue. On that day, two ICE agents investigated a tip regarding Flores-Mora's mother and identified her likely residence. A friend of Flores-Mora, Roberto Martinez-Rodriguez, answered the door of the house and invited

the agents inside.  While the agents were speaking to his friend, Flores-Mora emerged from a bedroom.  Flores-Mora spoke with the agents and told them that he had been born in Mexico and illegally entered the United States around 1995.  He also produced a Mexican passport.  The agents asked Flores-Mora and his friend to follow them to a local ICE office for civil processing as aliens present in the United States illegally, after which they would receives notices to appear in Immigration Court and would be free to go.  Flores-Mora drove his own vehicle with Martinez-Rodriguez and followed the agents to the ICE office.  At the office, they were kept in a small cell-like room and separately processed and questioned.  They were given notices to appear and released.  The agents did not provide Flores-Mora Miranda warnings at any point in the day.

  After an evidentiary hearing and briefing by the parties, the court orally granted in part and denied in part the motion to suppress.[1]  The court granted the motion with respect to statements allegedly made at the ICE office, but denied it as to statements allegedly made at the house.  This order sets forth the basis for the denial.  See, e.g., United States v. Joubert, 980 F. Supp. 2d 53, 55 n.1 (D.N.H. 2014), aff'd, 778 F.3d 247 (1st Cir. 2015) (citing In re Mosley, 494 F.3d 1320, 1328 (11th

---

[1] Order of Feb. 25, 2019.

2

Cir. 2007) (noting a district court's authority to later reduce its prior oral findings and rulings to writing)).

I. **Background**

In August 2009, ICE received an anonymous telephone tip that an illegal alien named Leticia Mora-Jaimes was residing at a house in Manchester, New Hampshire. Mora-Jaimes is Flores-Mora's mother. Jonathan Posthumus, an ICE special agent, investigated the tip and found corroborating public records. At approximately 1 p.m. on September 8, 2009, Agent Posthumus and Special Agent Michael Meyers went to the residence. They were dressed in plain clothes. They knocked on the door of the house and an individual they later identified as Roberto Michael-Rodriguez opened it. The agents identified themselves as ICE agents and explained that they were looking for Mora-Jaimes. Martinez-Rodriguez said that Mora-Jaimes resided there with her husband, Richard Champagne, but that no one other than himself was currently present. He stated that he was a friend of the family and Mora-Jaimes had recently left to go to Mexico for her mother's funeral. The agents asked Martinez-Rodriguez for identification, and he produced a counterfeit California driver's license bearing a false name. They asked where he was born, and he stated he was born in Mexico.

3

While the agents were speaking with Martinez-Rodriguez in a living room, Flores-Mora emerged from a back bedroom. Flores-Mora had been sleeping in the bedroom. Rain prevented him from working at his usual construction job that day. He had received a call about another potential job, and had exited the bedroom to get a pen and paper to take down details. Flores-Mora took down the information and finished his phone call, and the agents then identified themselves. Agent Posthumus showed Flores-Mora his credentials and explained that they were looking for Mora-Jaimes. Flores-Mora answered that she was his mother and that she had recently departed for Mexico because of the death of her mother. Agent Posthumus showed Flores-Mora a State Department photograph of Mora-Jaimes and Flores-Mora confirmed that it depicted his mother. The agents questioned Flores-Mora as to his place of birth. He stated that he was born in Mexico and is a Mexican citizen. He admitted that he was unlawfully present in the United States and came to the United States as a small child via the Texas border. Flores-Mora referred to Martinez-Rodriguez as "Roberto," revealing the falsity of the driver's license. The agents asked for documentation of the men's identities, and both Flores-Mora and Martinez-Rodriguez provided Mexican passports, which they retrieved from bedrooms and gave to Agent Posthumus. The agents did not enter the

bedrooms, but did accompany them to the bedroom doors to ensure their own safety.

The agents informed Flores-Mora and Martinez-Rodriguez that based on the information provided they were both aliens unlawfully present in the United States. The agents said that they would need to serve both men with a Notice to Appear to place them in removal proceedings, but would most likely release them on their own recognizance. The agents proposed that the men follow them in their own vehicle to the ICE office to complete this paperwork, so that they would have a ride home when the processing was complete. At approximately 1:30 p.m., Flores-Mora drove his vehicle with Martinez-Rodriguez and followed the ICE agents to their office.

At the ICE office, the agents separated themselves from Flores-Mora and Martinez-Rodriguez, and instructed them to enter through the front door and wait in the lobby. The agents then brought the men to the policy and processing area and placed them in a small, locked cell. They were then taken individually to be photographed, fingerprinted, and booked. One of the men asked whether this processing constituted an arrest, and Agent Meyers informed him that it did "count as an administrative arrest." The agents researched the men's criminal records and consulted with their ICE supervisor about whether the men could be released. The agents also asked the men if they would be

willing to assist ICE in identifying other illegal aliens. Flores-Mora refused. At approximately 3 p.m., the agents issued Notices to Appear to both men and released them. Their passports were not returned to them.

**II.  Analysis**

Flores-Mora argues that since the statements he made at his residence were not preceded by Miranda warnings, they were the product of custodial interrogation and must be suppressed as violations of his Fifth Amendment rights. The court disagrees and finds that no custodial interrogation occurred at the residence.

    **A.  Fifth Amendment and custodial interrogation**

The Fifth Amendment to the United States Constitution protects criminal defendants from compelled self-incrimination. U.S. Const. Art. V.  "'The Supreme Court developed the Miranda rules as a prophylactic measure to dissipate the coercion inherent in the custodial interrogation setting, with a goal of ensuring that any statements made by a suspect are truly the product of free choice' and consistent with the Fifth Amendment to the United States Constitution." United States v. Molina-Gomez, 781 F.3d 13, 21 (1st Cir. 2015) (quoting United States v. Vázquez, 857 F.2d 857, 861 (1st Cir. 1988)).  "It is well established that Miranda warnings must be communicated to a

suspect before he is subjected to 'custodial interrogation.'" United States v. Li, 206 F.3d 78, 83 (2000). "Both 'custody' and 'interrogation' must be present to require Miranda warnings." Molina-Gomez, 781 F.3d at 22.

Only custody is at issue here, as the government never contested that any statements elicited from Flores-Mora were obtained via interrogation.[2] "Custody exists where there is 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" Molina-Gomez, 781 F.3d at 22 (quoting United States v. Fernández-Ventura, 85 F.3d 708, 710 (1st Cir. 1996)). Determining whether someone has been subject to a "restraint on freedom of movement of the degree associated with a formal arrest" involves "two distinct inquiries: 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" United States v. Infante, 701 F.3d 386, 396 (1st Cir. 2012) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). Whether custody exists "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." United States v. Hughes, 640

---

[2] See Obj. to Mot. to Suppress (doc. no. 31) at 5-6.

7

F.3d 428, 435 (1st Cir. 2011) (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).

B.  **Lack of custody at house**

The First Circuit Court of Appeals has identified four factors that, among others, guide whether a set of circumstances amounts to custody: "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Hughes, 640 F.3d at 435 (quoting Fernández-Ventura, 85 F.3d at 711). All four of these factors weigh against finding that Flores-Mora was in custody at the house.

First, the questioning took place at Flores-Mora's residence, which he described as "my house in Manchester."[3] This questioning "occurred in surroundings familiar to the defendant: his own home." Hughes, 640 F.3d at 435. "Though questioning in a suspect's dwelling may at times comprise a custodial interrogation, such a location generally presents a less intimidating atmosphere than, say, a police station." Id. at 435-36 (citations omitted). While Flores-Mora may have naturally been surprised at the agents' presence in the house,

---

[3] Statement of Eleazar Flores-Mora (doc. no. 30-3).

8

they were allowed in by Martinez-Rodriguez.  While certainly not dispositive of this factor, there is no evidence that either one voiced or privately harbored any objection to the agents' presence.  Flores-Mora was able to complete a phone call without interruption before speaking with the agents.  And the questioning took place in a living room.  Flores-Mora testified that Agent Meyers followed him to the doorway of his bedroom when he went to retrieve his passport.  According to Flores-Mora, Agent Meyers explained this as "safety protocol,"[4] and further Flores-Mora testified that Agent Meyers remained outside the bedroom and did not enter.  There is "nothing in the record to suggest that the officers either exploited [the home's] cozy confines or invaded the defendant's personal space." Id. at 436.  The familiarity of the surroundings thus weighs against a finding of custody.

Second, two ICE officers were present during the questioning.  Two officers does not suggest custody under these circumstances.  See id. (non-custodial where four officers present but only two participated in interrogation); United States v. Nishnianidze, 342 F.3d 6, 12, 14 (1st Cir. 2003) (interrogation by three officers non-custodial); United States v. Quinn, 815 F.2d 153, 157, 161 (1st Cir.1987) (interrogation

---

[4] Tr. of Suppression Hearing (doc. no. 49) at 16-17, 59-60.

in presence of five officers non-custodial). And Flores-Mora and Martinez-Rodriguez were not separated during the questioning at the house. Two agents were thus interviewing both Flores-Mora and his friend. This arrangement weighs against a finding of custody.

Third, Flores-Mora was not physically restrained in any way at the house. Indeed, he emerged from a bedroom unannounced and without a physical reaction from the agents,[5] and was asked to drive himself to the ICE office at the conclusion of the questioning. So this factor weighs against custody.

Fourth, the interrogation at the house lasted approximately 30 minutes. Both Agent Posthumus and Flores-Mora testified that the conversation there was pleasant and courteous.[6] Flores-Mora also testified that after the agents "identified themselves as officers, I believe that you pretty much have to do what they tell you."[7] But these "subjective views," absent a basis in objective conditions, do not indicate custody. See Hughes, 640 F.3d at 435. The duration and character of the interrogation weigh against custody.

---

[5] The agents had been told that Martinez-Rodriguez was alone in the house.

[6] Tr. of Suppression Hearing (doc. no. 49) at 16-17, 59-60.

[7] Id. at 47.

All four factors weigh against finding that Flores-Mora was in custody. Flores-Mora may have subjectively felt that he was not at liberty to terminate the interrogation or leave because of his status as an undocumented alien. But, again, this does not enter into the objective custody analysis. See Hughes, 640 F.3d 428, 435; Yarborough v. Alvarado, 541 U.S. 652, 666-669 (rejecting consideration of defendant's "prior history with law enforcement" and "contingent psychological factors"); cf. United States v. Magana, 70 F. App'x 859, 865 (6th Cir. 2003) (unpublished) (objective Fourth Amendment seizure analysis presumes a "reasonable, innocent person" so district court erred by considering that defendant "knew that he was an illegal alien and that an I.N.S. agent was present"). Flores-Mora was not in custody when he was questioned at his home.[8] Thus, no custodial interrogation triggering the need for Miranda warnings took place.

---

[8] Flores-Mora argues that the fact that his passport was seized is relevant to the custody analysis. Def's Reply to Gov's Suppl. Obj. (doc. no. 51) at 8. But even if this factor is relevant, Flores-Mora's passport was not taken until after he had already admitted his citizenship and alienage to the agents. In other words, even if turning over his passport converted the conditions into custodial conditions from that point forward, Flores-Mora made no further incriminating statements after that point, leaving no statements for the court to suppress.

11

## III. Conclusion

Flores-Mora was not in custody during the events at his residence, but was in custody when questioned at the ICE office. The court thus GRANTED IN PART and DENIED IN PART Flores-Mora's motion to dismiss,[9] suppressing only statements made at the ICE office.

**SO ORDERED.**

/s/ Joseph N. Laplante
Joseph N. Laplante
United States District Judge

Dated: June 26, 2019

cc: Helen W. Fitzgibbon, AUSA
    Jeffrey S. Levin, Esq.

---

[9] Document no. 30.